The STATE of Ohio, Appellee,

v.

TREWARTHA, Appellant.

[Cite as *State v. Trewartha,* 165 Ohio App.3d 91, 2005-Ohio-5697.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 04AP–963.

Decided Oct. 27, 2005.

Ron O'Brien, Franklin County Prosecuting Attorney, and Richard Termuhlen II, Assistant Prosecuting Attorney, for appellee.

W. Joseph Edwards, for appellant.

Bryant, Judge.

{¶ 1} Defendant-appellant, Kevan M. Trewartha, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to a jury verdict, of aggravated murder committed during an aggravated robbery in violation of R.C. 2903.01, with the capital specification of prior calculation and design under R.C. 2929.04(A)(7). Because the evidence supports the jury's finding that defendant violated R.C. 2903.01, but does not support a violation of R.C. 2929.04(A)(7), we affirm in part and reverse in part.

{¶ 2} By indictment filed March 14, 2003, defendant was charged with seven counts, each with a firearm specification: two counts of aggravated murder with capital specifications, aggravated robbery, two counts of robbery, tampering with evidence, and possession of a deadly weapon while under a disability. Relevant to this appeal, count one charged defendant with aggravated murder committed while in the course of an aggravated robbery with an R.C. 2929.04(A)(7) capital specification asserting that defendant was either the principal offender in the aggravated murder or defendant committed the aggravated murder with prior calculation and design. The second count charged defendant with aggravated murder committed with prior calculation and design and included the same capital specification as the first count.

{¶ 3} Defendant's indictment arose out of events occurring on Sunday, February 23 and the early morning hours of Monday, February 24, 2003. According to the state's evidence, at around 3:00 p.m. on Sunday, James Stephens picked up defendant, and the two cruised their Whitehall neighborhood in Stephens's new Chevy Blazer, drinking beer and taking the prescription drug Xanex. The two soon stopped at the house of defendant's girlfriend. Defendant went into the house, also his residence at the time, and emerged with a .38 Taurus revolver he had acquired two days earlier from a friend, Anthony Marinello.

{¶ 4} After showing the revolver to Stephens, defendant got back in Stephens's car and they drove to Corey Leggett's house, arriving around 4:00 p.m. Leggett accompanied defendant and Stephens for a quick ride. While driving around the neighborhood, Leggett pointed out the home of Herbert Dingess, and the three conversed about a mutual acquaintance who regularly broke into Dingess's house to steal "weed and stuff." After five or ten minutes, Stephens and defendant dropped off Leggett at his girlfriend's house.

{¶ 5} At approximately 9:00 or 10:00 p.m., Stephens and defendant, both visibly drunk, arrived at the house of Christa Cooper and her roommate, Nina Maestle. Around 12:00 a.m., when Cooper asked Stephens to leave because of his rowdy behavior, defendant accompanied Stephens out to his Blazer. Immediately

before defendant's departure from Cooper's house, Maestle saw that defendant had the .38 Taurus revolver.

{¶ 6} Stephens testified that once he and defendant were in the Blazer, defendant asked Stephens if he "could give crazy Kev a ride." From Cooper's house, Stephens and defendant went directly to Dingess's house. Sometime shortly before the arrival of Stephens and defendant, two of Dingess's friends, Venus Chandler and Chris Hershey, left Dingess's house for the night.

{¶ 7} According to Stephens, upon arriving at Dingess's house, defendant walked directly to the front door. Before Stephens reached the house, and while defendant was in the house, Stephens heard someone inside yell and then heard a gunshot. Stephens hurried into the house and found Dingess lying on the floor with a gunshot wound to his face. Not seeing defendant, but hearing him move through the house, Stephens walked around to the back bedroom and waited for defendant. After defendant left the bedroom, he and Stephens left Dingess's house and sped away from the scene in Stephens's Blazer.

{¶ 8} Moments after leaving Dingess's house, Stephens wrecked his Blazer on a nearby telephone pole. A witness heard the crash and looked out the window; he saw defendant pull a gun out of his pants and bury it in the snow. Defendant subsequently removed the gun from the location, and two witnesses saw defendant later deposit the gun near a speed limit sign. Officer Scott Miller recovered Marinello's .38 Taurus revolver from the second location, and he also recovered a gold chain at the scene of the accident. Chandler later identified the gold chain as the one Dingess was wearing the night he died.

{¶ 9} Stephens and defendant fled the accident scene but soon were apprehended. From defendant the police recovered Dingess's money clip containing the same amount of money last known to be in Dingess's possession. Later that afternoon, on Monday, February 24, 2003, an acquaintance arrived at Dingess's house to find the victim's body lying just inside the doorway. The acquaintance called the paramedics, but Dingess was pronounced dead upon their arrival. An autopsy revealed that Dingess died almost immediately from the brain trauma caused by a single gunshot wound to his head.

{¶ 10} The jury found defendant guilty of aggravated murder in the course of an aggravated robbery. In addressing the capital specifications to that count, the jury concluded that defendant was not the principal offender, but that he had committed aggravated murder with prior calculation and design during the commission of an aggravated robbery with a firearm. The jury also found defendant guilty of aggravated robbery and tampering with evidence, each with a firearm specification, and possessing a weapon while under a disability. The jury was not instructed on the lesser robbery offenses, and defendant was acquitted of

the second charge of aggravated murder that alleged that defendant acted with prior calculation and design.

{¶ 11} After a mitigation hearing, the court imposed the jury-recommended sentence of 30 years to life for the aggravated murder charge of which defendant was found guilty. The court also sentenced defendant to a three-year term for the firearm specification, a nine-year term for aggravated robbery, a three-year term for tampering with evidence, a one-year term for the firearm specification offense, and an 11–month term for having a weapon while under a disability, all to be served consecutively. Defendant appeals and assigns a single error:

> The trial court erred when it entered judgment against the defendant when the evidence was insufficient to sustain a conviction and was not supported by the manifest weight of the evidence.

{¶ 12} Although defendant's assignment of error is worded broadly, defendant's argument in support is directed to whether the sufficiency and manifest weight of the evidence support the jury's finding defendant guilty of the capital specification of prior calculation and design under R.C. 2929.04(A)(7). Sufficiency of the evidence inquires " 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Goodwin* (1999), 84 Ohio St.3d 331, 343–344, 703 N.E.2d 1251, quoting *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. The verdict will not be disturbed unless it is determined that reasonable minds could not have reached the conclusion the trier of fact reached. *Goodwin,* 84 Ohio St.3d at 344, 703 N.E.2d 1251.

{¶ 13} When presented with a manifest-weight challenge, the appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence permits reasonable minds to find guilt beyond a reasonable doubt. *State v. Conley* (Dec. 16, 1993), Franklin App. No. 93AP–387, 1993 WL 524917. To make the determination, the court reviews the entire record as the "thirteenth juror" and decides whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

{¶ 14} Preliminarily, we note that the jury returned inconsistent verdicts: the jury found defendant guilty on one count of aggravated murder with a capital specification of prior calculation and design, but not guilty of a second count alleging aggravated murder with prior calculation and design. Defendant suggests that the jury's inconsistent verdicts shore up his argument that insufficient

evidence supports the capital specification. While the jury's verdicts appear wholly inconsistent on the element of prior calculation and design, the discrepancy alone is not grounds for setting aside the verdict on the capital specification.

{¶ 15} Consistency between verdicts on several counts of an indictment is unnecessary where the defendant is convicted on one or some counts and acquitted on others; the conviction generally will be upheld irrespective of its rational incompatibility with the acquittal. *State v. Adams* (1978), 53 Ohio St.2d 223, 7 O.O.3d 393, 374 N.E.2d 137, vacated in part on other grounds, 439 U.S. 811, 99 S.Ct. 69, 58 L.Ed.2d 103. Each count of a multicount indictment is deemed distinct and independent of all other counts, and thus inconsistent verdicts on different counts do not justify overturning a verdict of guilt. See *State v. Hicks* (1989), 43 Ohio St.3d 72, 78, 538 N.E.2d 1030; *State v. Brown* (1984), 12 Ohio St.3d 147, 12 OBR 186, 465 N.E.2d 889, paragraph one of the syllabus; *State v. Washington* (1998), 126 Ohio App.3d 264, 276, 710 N.E.2d 307. "[T]he sanctity of the jury verdict should be preserved and could not be upset by speculation or inquiry into such matters to resolve the inconsistency." *State v. Lovejoy* (1997), 79 Ohio St.3d 440, 444, 683 N.E.2d 1112.

{¶ 16} In accord with the Ohio Supreme Court's holdings, the noted inconsistency cannot be attributed solely to the jury's insecurity, confusion, or doubts as to the adequacy of evidence on the issue of prior calculation and design. Rather, the jury, convinced that defendant was guilty of aggravated murder and the capital specification under count one, may have acquitted defendant of aggravated murder on count two based on compromise or leniency. Moreover, since an appellate court is not permitted to speculate about the reason for the inconsistency when it determines the validity of a verdict, the inconsistency here is not enough in itself to undermine the final judgment.

{¶ 17} Apart from noting the inconsistent verdicts, defendant contends that the evidence fails to show that the murder was anything but a spontaneous eruption of events that did not involve prior calculation and design. In 1974, the "prior calculation and design" standard replaced the more traditional "deliberate and premeditated malice" standard. *State v. Cotton* (1978), 56 Ohio St.2d 8, 11, 10 O.O.3d 4, 381 N.E.2d 190. Under the former standard, "a killing could be premeditated even though conceived and executed on the spur of the moment." Id. "Prior calculation and design," however, is a more stringent standard. Id. It continues to "embody the classic concept of the planned, cold-blooded killing while discarding the notion that only an instant's prior deliberation is necessary." *State v. Taylor* (1997), 78 Ohio St.3d 15, 19, 676 N.E.2d 82. Rather than instantaneous deliberation, prior calculation and design requires a scheme designed to implement the calculated design to kill. *Cotton* at 11, 10 O.O.3d 4, 381 N.E.2d 190. "Prior calculation and design requires 'some kind of studied analysis

with its object being the means by which to kill.' " *State v. Ellenwood* (Sept. 16, 1999), Franklin App. No. 98AP–978, 1999 WL 717998, quoting *State v. Jenkins* (1976), 48 Ohio App.2d 99, 102, 355 N.E.2d 825.

**{¶ 18}** While the Ohio Supreme Court has declined to uphold findings of prior calculation and design in "explosive, short-duration situations," the court nonetheless has upheld some "short-lived emotional situations" that do not fit the classic mold of a "planned, cold-blooded killing." *Taylor*, 78 Ohio St.3d at 19–20, 676 N.E.2d 82. Because no bright-line test or a rigid set of factors defines the presence of prior calculation and design, the determination of whether an accused acted with prior calculation and design "turns on the particular facts and evidence presented at trial." Id. at 20, 676 N.E.2d 82. Consequently, "[w]here evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *Cotton*, at paragraph three of the syllabus.

**{¶ 19}** The state can prove "prior calculation and design" from the circumstances surrounding a murder in several ways: (1) evidence of a preconceived plan leading up to the murder, (2) evidence of the perpetrator's encounter with the victim, including evidence necessary to infer that the defendant had a preconceived notion to kill regardless of how the robbery unfolded, or (3) evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill. See, e.g., *State v. Cassano*, 96 Ohio St.3d 94, 2002–Ohio–3751, 772 N.E.2d 81; *Goodwin*, 84 Ohio St.3d 331, 703 N.E.2d 1251; State v. Campbell (2000), 90 Ohio St.3d 320, 738 N.E.2d 1178.

{¶ 20} Here, the state failed to meet the first method of proving prior calculation and design, as it did not produce direct or circumstantial evidence of a preconceived plan leading up to the victim's murder. Twenty-two witnesses testified at trial. The vast majority of the state's witnesses provided testimony regarding either defendant's whereabouts on the day of the murder, defendant's possession of the gun, or the victim's possession of a gold chain and wallet. Such evidence, however, demonstrates only that defendant had a plan to rob Dingess; it does not show a plan to kill him. See, e.g., *Cassano* at ¶ 80 (holding that prior threats of murder show prior calculation and design); *State v. Coley* (2001), 93 Ohio St.3d 253, 263, 754 N.E.2d 1129 (holding that the abduction and transportation of victim to a dead-end alley before murder shows a plan to kill).

{¶ 21} Only the testimony of James Stephens provided significant evidence on the circumstances leading up to the murder. According to Stephens, he accompanied defendant for virtually the entire day prior to and immediately after the

murder of Dingess. He described defendant's whereabouts and how defendant acquired the gun that shot Dingess. Stephens testified that although defendant showed him the gun, defendant did not tell him why he needed the gun or what he would do with it.

{¶ 22} Stephens also testified as to defendant's encounter with Leggett, who, during the course of their drive, pointed out Dingess's house and noted that a mutual acquaintance robbed it. Stephens testified that defendant reacted sarcastically when Leggett spoke about the Dingess robberies, as if he did not care.

{¶ 23} Stephens acknowledged that defendant wore a black leather jacket; according to the testimony of Cooper's roommate, Maestle, the jacket contained the murder weapon approximately one hour before defendant and Stephens went to Dingess's house. Upon leaving Cooper's house, Stephens testified that defendant asked if Stephens "could give crazy Kev a ride." After this request, Stephens recalled no conversation between them on their journey between Cooper's house and Dingess's house.

{¶ 24} Since Stephens could not directly testify that defendant had a preconceived plan of killing Dingess, prior calculation and design must be determined from all the facts and circumstances leading up to the murder. To this point, Stephens's testimony, even when corroborated, merely proved that defendant possessed a gun at the time he arrived at Dingess's house, that defendant talked with Leggett about past robberies of the Dingess house, and that defendant referred to himself as "crazy Kev."

{¶ 25} Such evidence does not show "a scheme designed to implement the calculated design to kill." Aggravated robberies are committed with a deadly weapon. See R.C. 2911.01. Possession of a deadly weapon during a robbery is not uncommon and, by itself, does not prove more than a plan to commit aggravated robbery. Linking the murder weapon to defendant may demonstrate a plan to commit aggravated robbery, but it is insufficient to prove that defendant committed the murder with the required aforethought.

{¶ 26} The state suggests that defendant's plan to kill Dingess arose after defendant had a conversation with Leggett. The state argues that the time between the conversation and the murder was long enough to satisfy the required period of aforethought. Although the time period is enough to formulate a calculated plan to kill, nothing in the state's evidence suggests that defendant employed the time to prepare such a plan, because the conversation between defendant and Leggett involved past robberies, not murders.

{¶ 27} Finally, defendant's reference to himself as "crazy Kev" is insufficient to prove prior calculation and design. See *State v. Reed* (1981), 65 Ohio St.2d 117, 19 O.O.3d 311, 418 N.E.2d 1359 (holding that when the only evidence of intent in

a murder resulting from an alleged robbery is the shooting itself, and a prior statement by the defendant that "if a cop got in his way [during the robbery] he would blow him away," the evidence is insufficient to establish prior calculation and design). Defendant's self-reference is too ambiguous to show intent or a plan to kill.

{¶ 28} Although the state failed to present sufficient direct or circumstantial evidence of a preconceived plan leading up to Dingess's murder, the state can nevertheless circumstantially prove prior calculation and design, under the second of the noted three ways, through evidence of the defendant's encounter with Dingess. In *Goodwin,* the Ohio Supreme Court found sufficient evidence to prove prior calculation and design because (1) the defendant placed his gun to the forehead of a cooperative and unresisting victim who at that moment was standing with his arms raised above his head, (2) with the victim in this vulnerable position, the defendant pulled the trigger, instantly killing the clerk, (3) the defendant did not flee the store after this cold-blooded killing, but placed the gun to the head of the other clerk and continued robbing the store. Id. at 344, 703 N.E.2d 1251.

{¶ 29} As the court explained, the murder required defendant to think in placing the gun at the victim's forehead, and it required additional time for the defendant to decide to pull the trigger in order to carry out a calculated plan to obtain money from the store. Id. On those facts, the court held that the homicide was not a spur-of-the-moment accidental shooting, but an aggravated murder done with prior calculation and design. Id.

{¶ 30} Here, according to Stephens, defendant immediately walked up to and entered Dingess's house, while Stephens lagged behind. Although Stephens eventually followed defendant, he did not reach the front door before he heard someone say something, possibly "hey," and then he heard a gunshot. According to his testimony, Stephens could not see inside the house when he heard the commotion, and he did not see how Dingess was shot. When Stephens entered the house, he saw Dingess lying on the floor. After realizing that Dingess was dead, Stephens looked for defendant. Upon finding defendant in the back bedroom, Stephens and defendant left the house. The two fled in Stephens's Blazer before hitting a nearby telephone pole.

{¶ 31} The state contends that Stephens's testimony, coupled with the testimony of Dr. Dorothy Dean and Mark Hardy, provides the necessary evidence of prior calculation and design. Dr. Dean, a forensic pathologist, testified that Dingess died from the brain trauma caused by a gunshot wound to his head. Dr. Dean stated that her autopsy of Dingess revealed some stippling, or large particles discharged from the weapon with the bullet, on Dingess's skin. She, however, found no soot, a very fine granule particle that discharges from a

weapon with the bullet. According to her testimony, her findings meant that the murder weapon was not "real, real close" to the victim but close enough to leave tiny abrasions on the skin from the stippling. Hardy, a criminologist for the Columbus Division of Police, corroborated Dr. Dean's evidence by testifying the muzzle of the murder weapon was less than 12 inches from Dingess's head at the time of discharge. With those facts, the state contends that the shooting was a close-range murder, as in *Goodwin.*

{¶ 32} Although, like *Goodwin,* the state here presented evidence that defendant shot Dingess at close range and continued to rob the premises, the state failed to demonstrate that the shooting was more than an instantaneous or spur-of-the-moment shooting. More particularly, the state failed to provide evidence of the circumstances of the encounter between the shooter and Dingess, evidence, as in *Goodwin,* necessary to infer that the defendant had a preconceived notion to kill regardless of how the robbery unfolded. See, also, *State v. Monroe,* 105 Ohio St.3d 384, 2005–Ohio–2282, 827 N.E.2d 285, ¶ 39.

{¶ 33} Closely related to the second way of proving prior calculation and design, the third way allows the state to satisfy its burden by showing that the murder was executed in such a manner that circumstantially proves a preconceived notion that the victim would be killed regardless of the situation. *Taylor,* supra, 78 Ohio St.3d 15, 676 N.E.2d 82; *State v. Palmer* (1997), 80 Ohio St.3d 543, 687 N.E.2d 685. Thus, if the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design. See *Campbell,* 90 Ohio St.3d at 330, 738 N.E.2d 1178; *Palmer* at 570, 687 N.E.2d 685; *Taylor* at 21, 676 N.E.2d 82; *State v. Mardis* (1999), 134 Ohio App.3d 6, 19, 729 N.E.2d 1272.

{¶ 34} For example, in *Campbell,* the Ohio Supreme Court concluded that the manner in which the victim was shot allowed the jury to reasonably find that the appellant committed aggravated murder with "prior calculation and design." The appellant ordered the victim to get down on the floorboard of his truck before shooting him twice at close range in the face and neck. Id., 90 Ohio St.3d at 330, 738 N.E.2d 1178. The court noted that a murder conducted in this fashion was not the sort of brief, explosive situation in which courts usually find insufficient evidence of prior calculation and design. Id.

{¶ 35} To apply the result in *Campbell* to the facts of this case would require that we equate a close-range shooting with a calculated execution-style murder, despite the absence here of the sequence of events that allowed the jury in *Campbell* to find prior calculation and design. See, e.g., *State v. Keenan* (1998), 81 Ohio St.3d 133, 140, 689 N.E.2d 929 (concluding the sequence of kidnapping a victim, driving him around at knifepoint, then driving him to a remote area, ordering him to "tilt his head back," then cutting his throat, shows more than a

spur-of-the-moment killing); *Palmer*, 80 Ohio St.3d at 570, 687 N.E.2d 685 (finding existence of prior calculation and design when victim was shot twice in an execution-style manner: one shot in the left temple then another in the right side of the head from point-blank range); *Taylor*, 78 Ohio St.3d at 21, 676 N.E.2d 82 (noting that the sequence of the appellant exchanging words with the victim, moving his girlfriend out of the way to strategically position the victim, and then the continued shooting of the victim after he was down, more than any other evidence, proved that the appellant acted with prior calculation and design); *Ellenwood*, at 10 (finding prior calculation and design based, in part, on appellant shooting unarmed and unthreatening victims in the back of the neck, one after the other). Since the state failed to show that the murder was executed in such a manner that circumstantially proves a preconceived notion to kill Dingess, the finding by the trier of fact of prior calculation and design is not justified. See *Cotton*, 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, at paragraph three of the syllabus.

{¶ 36} Accordingly, even when construed in a light most favorable to the state, the evidence is insufficient to find beyond a reasonable doubt that defendant calculated, schemed, or planned to kill Dingess before he shot him. The state did not present evidence of a robbery plan that also involved a plan to kill, of an encounter between the defendant and the victim, or of facts and circumstances surrounding the murder that would support a finding of "prior calculation and design" under R.C. 2929.04(A)(7), as a death occurring during an aggravated robbery does not in itself render the crime a capital offense. Because the evidence is insufficient to sustain the capital specification, we need not address the manifest weight of the evidence.

{¶ 37} In addition to arguing the insufficiency of evidence for the capital specification of "prior calculation and design," defendant contends that the evidence is insufficient to prove he aided and abetted in the murder of Dingess. Defendant argues that because the jury determined that he was not the principal offender, and because the murder was not committed with prior calculation and design, the record contains no evidence that defendant purposefully aided and abetted another in committing the offense of aggravated murder.

{¶ 38} As noted, consistency between verdicts on several counts of an indictment is unnecessary: where the defendant is convicted on one or some counts and acquitted on others, the conviction generally will be upheld irrespective of its rational incompatibility with the acquittal. *Adams*, 53 Ohio St.2d 223, 7 O.O.3d 393, 374 N.E.2d 137, supra. Determinations rendered on the respective specifications do not change a finding of guilt on an aggravated murder conviction. *State v. Perryman* (1976), 49 Ohio St.2d 14, 27, 3 O.O.3d 8, 358 N.E.2d 1040, vacated in part on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3136, 57

L.Ed.2d 1156. "[O]ne may be convicted of aggravated murder, the principal charge, without the specification. Thus, the conviction of aggravated murder is not dependent upon findings for the specifications thereto." Id.

{¶ 39} Defendant was found guilty of aggravated murder under R.C. 2903.01(B) for purposely causing the death of another while committing an aggravated robbery. As to the corresponding capital specification, the jury found that although he was not the principal offender, he committed the aggravated murder with prior calculation and design. The jury's determination that defendant was not the principal offender on the capital specification has no bearing on the underlying conviction of aggravated murder, nor does our determination that the state presented insufficient evidence to prove prior calculation and design. The aggravated-murder conviction remains irrespective of its rational incompatibility with the findings associated with the capital specification if the evidence is sufficient to sustain the conviction and is supported by the manifest weight of the evidence.

{¶ 40} The state presented sufficient evidence, when construed in the state's favor, that defendant, either as principal or as an aider and abettor, committed aggravated murder while committing an aggravated robbery. The state's witnesses linked defendant to procurement of the alleged murder weapon, placed defendant at the scene of the crime with the weapon, proximally connected defendant and the only other possible shooter to the victim at the time of the fatal gunshot, and associated defendant with property last seen on the victim's person. These facts are more than enough for a jury to directly or circumstantially find defendant guilty of aggravated murder while committing an aggravated robbery. Since defendant did not present his own evidence and did not discredit the state's witnesses to the point that a juror could not find guilt beyond a reasonable doubt, the verdict likewise is not against the manifest weight of the evidence.

{¶ 41} Accordingly, defendant's single assignment of error is sustained in part and overruled in part.

{¶ 42} Having sustained in part and overruled in part defendant's single assignment of error, we reverse the judgment of the trial court insofar as it found defendant guilty of the capital specification alleging prior calculation and design, we affirm the remainder of the trial court's judgment, and we remand the cause for resentencing on the murder conviction without a capital specification.

Judgment affirmed in part
and reversed in part,
and cause remanded.

KLATT and SADLER, JJ., concur.